**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0184n.06

**No. 10-1973**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Feb 15, 2012**

LEONARD GREEN, Clerk

SUE FRITZ,

    **Plaintiff-Appellant,**

v.

CHARTER TOWNSHIP OF COMSTOCK, a
public body; TIM HUDSON, individually and
in his official capacity as the supervisor for the
Charter Township of Comstock,

    **Defendants-Appellees.**

                                  /

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN

**BEFORE:** **COLE, CLAY, and COOK, Circuit Judges.**

    **CLAY, Circuit Judge.** Plaintiff Sue Fritz, a former insurance agent with Farm Bureau Insurance ("Farm Bureau"), appeals the district court's grant of summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure to Defendants Charter Township of Comstock (the "Township") and Tim Hudson ("Hudson"). Plaintiff alleges that Defendants engaged in unlawful retaliation against her under 42 U.S.C. § 1983 for exercising her First Amendment right to publicly criticize the residents and Township officials of Comstock.

    For the reasons set forth below, we **AFFIRM** the decision of the district court.

**BACKGROUND**

In February 2005, Plaintiff entered into a contract with Farm Bureau to become an independent agent affiliated with Farm Bureau. Her application for employment was approved by Richard Keilen ("Keilen"), an agency manager with Farm Bureau, and she became an "at will" employee with the company. In May of 2005, Plaintiff purchased a single-family home in the residential area of Comstock Township with the intent of converting the residence into a home office. Because Plaintiff's house was zoned for residential purposes, she applied for a variance to the Comstock Township Zoning Board. The Township eventually amended its zoning ordinance to include "insurance office" under the definition of and restrictions applicable to "home occupation." The following month, the Planning Commission approved Plaintiff's application for a Special Exception Use Permit, which allowed her to operate her business as a home office in a single family home.

Despite receiving permission to operate her insurance office in a residential district, Plaintiff was still required to comply with the Township's zoning ordinances, which placed restrictions on signage, parking, employees, and alterations to the office, and also required her to use the home as her residence. Shortly after Plaintiff received approval for her home office, she placed a "Fritz Agency" sign on her front lawn and a second sign on her car parked on the driveway. The Township issued Plaintiff a signage violation for a non-complying sign. Plaintiff then requested a sign variance and attended a Zoning Board of Appeals meeting at which Plaintiff's request was denied. She alleged that at the zoning board meeting, several false statements were made about her and her business by residents and officials of Comstock.

Many of Plaintiff's neighbors raised concerns with the Township and Farm Bureau about the appearance of her house and the signage. Residents complained that Plaintiff's house appeared "too business looking" and that she failed to comply with the zoning requirements. Keilen stated at his deposition that he received a number of complaints from residents in the community. He also learned that the neighbors planned to circulate a petition in the community to remove Plaintiff's home office from the neighborhood. Keilen wanted to maintain good public relations with the community and attempted to alleviate some of the conflict between Plaintiff and her neighbors. Keilen contacted Robert Luxmore ("Luxmore"), the regional director of agencies for Farm Bureau, to discuss the issues around Plaintiff's home office. Luxmore advised Keilen to contact the Township supervisor, Tim Hudson.

Keilen contacted Hudson on July 28, 2006, regarding Plaintiff's home office and asked a series of questions about the Township ordinance, whether Plaintiff was in compliance with the ordinance, and the residents' complaints. Keilen took notes to document the phone conversation. During this conversation, Keilen and Hudson also discussed Plaintiff's comments in planning commission meetings, a petition in the neighborhood against Plaintiff, and a letter to the editor written by Plaintiff in which Hudson alleged that she "bashed" Comstock. Hudson allegedly complained about Plaintiff's attendance at Comstock meetings as well as her public comments. Hudson warned Keilen that "Farm Bureau's presence in Comstock was in jeopardy because of Ms. Fritz's speech and conduct . . . and that Comstock was allegedly in an uproar about it." (R.1: Compl. ¶ 34–35.) Hudson allegedly stated to Keilen that there would be "adverse consequences to her and Farm Bureau from a public relations perspective." (*Id*. at ¶ 32.) Hudson also allegedly stated that

if Plaintiff "would tone down her speech and remove her sign, her problems might go away." (*Id.* at ¶ 27.)

Shortly after Keilen's conversation with Hudson, Keilen contacted Plaintiff to discuss a number of concerns raised by the Township residents and also to address whether Plaintiff was in compliance with the Township ordinances. Keilen requested Plaintiff to take down the sign in front of her house and to park the car in the garage when she is at home. According to Keilen, Plaintiff ignored his suggestions for the reason that she thought they were "foolish and [she] wasn't going to comply with any of them." (R.66–5: Keilen Dep. 43.)

Farm Bureau also conducted a separate investigation into Plaintiff's home office. In November 2006, Beth Goodman ("Goodman"), a former manager of commercial processing at Farm Bureau, initiated a separate investigation into some of the residents' complaints about Plaintiff's home office. She also contacted Tim Hudson to further investigate the complaints received by Farm Bureau inquiring whether Plaintiff's office was in compliance with the Township ordinance. During Goodman's conversation with Hudson, she learned for the first time about the Township zoning ordinance and was concerned that some of the Township's policies were in direct conflict with Farm Bureau's insurance requirements. In addition, Goodman also contacted Ken Sparks, the Township attorney, to further investigate the complaints. In January 2007, Goodman received a phone call from Sparks about complaints from the neighborhood about Plaintiff's home office. Sparks also wanted to know if Farm Bureau was internally handling the situation involving Plaintiff. Goodman acknowledged that "at that point [she] knew that the township's requirements and our requirements weren't going to work together." (R. 69–19: Goodman Dep. 36.)

In addition to Plaintiff's contentious relationship with the Township residents, Plaintiff was also struggling to perform her job at an acceptable level. Plaintiff sent an email to Keilen on September 26, 2006, which Keilen interpreted as unprofessional, unacceptable, and close to insubordination. The email discussed Plaintiff's intention to stop working for the remainder of the month because she felt unmotivated to work. Keilen notified Plaintiff that her email and attitude could be grounds for termination and that her behavior would not be tolerated by Farm Bureau. Plaintiff acknowledged in her deposition that many of these email exchanges with Keilen were true and accurate.

The following month, Plaintiff and Keilen met in-person and Plaintiff expressed her frustration over being an agent and that she found the work to be very demanding. Keilen also discovered that Plaintiff failed to apply herself at career school, which all insurance agents were required to attend. In addition, Plaintiff failed to follow company procedures and her attitude and conduct towards clients and other agents was unacceptable. (R.66–5: Keilen Dep 55–57.)

On March 22, 2007, Luxmore terminated Plaintiff's employment with Farm Bureau. The termination letter stated the following:

> The reasons for this termination relate to your working relationship with employees of the Company and/or other Farm Bureau Insurance companies and to your controversial community relations with your neighbors and with the local governmental unit. Their comments and complaints have led the Company to conclude that your practices and methods are resulting in contentious and undesirable public controversy. The Company is concerned that this detracts from the public's image and perception of the Company, in particular and the Farm Bureau organization, in general. As a result, the Company has concluded that it is not in the best interest of the Company to continue your Agent Employment Agreement.

(R.66–9: Br. in Supp. of Second Mot. for Summ. J. Ex.11.)

No. 10-1973

Plaintiff filed this 42 U.S.C. § 1983 action on December 14, 2007, seeking damages, injunctive relief, and attorneys' fees. She alleged in her complaint that the Charter Township of Comstock and its supervisor, Tim Hudson, made disparaging and false statements about her in retaliation for Plaintiff exercising her First Amendment rights to speak critically of them in the press and in public meetings. Plaintiff also alleged state law claims of tortious interference with contract, tortious interference with business relationship or expectancy, and defamation.

On May 8, 2008, Defendants filed a motion for summary judgment against Plaintiff. The district court treated the motion for summary judgment as a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure in-as-much as Defendants relied upon that rule and did not offer any matters for consideration beyond the pleadings. The district court dismissed Plaintiff's First Amendment claim for failure to state a claim and her supplemental state law claims were dismissed without prejudice. Plaintiff appealed on January 28, 2010. The district court's dismissal of Plaintiff's First Amendment retaliation claim was reversed because this court found that Plaintiff's allegations in her complaint were sufficient to state a claim for retaliation under § 1983 and remanded for further proceedings. *See Fritz v. Charter Twp. of Comstock*, 592 F.3d 718 (6th Cir. 2010). Plaintiff's state law claims were dismissed without prejudice.

On remand, Defendants filed a second motion for summary judgment on Plaintiff's First Amendment retaliation claim on May 5, 2010. The district court granted Defendant's motion, finding no evidence in the record to support Plaintiff's claim for the adverse action element of her retaliation claim. Plaintiff timely filed this appeal.

6

## DISCUSSION

**I.      Standard of Review**

We review a district court's grant of summary judgment *de novo*. *Rodgers v. Monumental Life Ins. Co.*, 289 F.3d 442, 448 (6th Cir. 2002). Summary judgment is appropriate if the pleadings, discovery, and disclosure materials on file, and any affidavits "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). After the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**A.      First Amendment Retaliation**

Plaintiff argues that Hudson made adverse and retaliatory comments with the intent to harm her business reputation and economic interests for exercising her First Amendment rights. She claims that Hudson's comments were a motivating factor in her dismissal from employment at Farm Bureau.

In order to survive summary judgment on a First Amendment retaliation claim, Plaintiff must present sufficient evidence to create a triable issue of fact as to each of the following elements:

> (1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Mezibov v. Allen*, 411 F.3d 712, 717 (6th Cir. 2005). This inquiry is context driven and "the underlying concepts that [the elements] signify will vary with the setting-whether activity is 'protected' or an action is 'adverse' will depend on context." *Thaddeus-X v. Blatter*, 175 F.3d 378, 388 (6th Cir. 1999) (en banc). "[I]f the plaintiff establishes the three elements, the burden of production then shifts to the defendants to show that their actions would not have been different absent the plaintiff's protected conduct." *Smith v. Craven*, 61 F.App'x 159, 161 (6th Cir. 2003) (citing *Thaddeus-X*, 175 F.3d at 400)).

### 1. Protected Conduct

Under the first element, Plaintiff must establish that she was engaged in conduct protected by the First Amendment. *Thaddeus-X*, 175 F.3d at 394–95. It is undisputed that Plaintiff's public speech at public meetings and in the newspapers would be considered protected speech under the First Amendment. *See Paige v. Coyner*, 614 F.3d 273, 280 (6th Cir. 2010) (finding that a private citizen "engaged in protected activity by attending the Port Authority hearing and voicing her opinion concerning a proposed interstate project" constituted protected speech). *See also Glasson v. City of Louisville*, 518 F.2d 899, 904 (6th Cir. 1975) (finding that "freedom of expression upon public questions is secured by the First Amendment").

Defendants contend, however, that Plaintiff's "personality and inappropriate conduct are not constitutionally protected . . . and that one cannot shield their offensive personality or conduct by engaging in protected speech at the same time." (Defs.' Br. 45.) We find that such a narrow distinction by Defendants is unwarranted and does not affect the disposition of this case. Some of

the speech at issue in this appeal was made in the context of public Township meetings, which as stated above triggered protection under the First Amendment.

### 2. Adverse Action

After establishing that Plaintiff's conduct is protected by the First Amendment, we then determine whether Defendants' alleged conduct was sufficient to state a claim for an adverse action. To determine whether an adverse action exists requires a "reasonable trier of fact [to] conclude that a retaliatory act [against Plaintiff] would deter a person from exercising his rights. *Siggers–El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005). The deterrent effect of the adverse action, however, "need not be great in order to be actionable." *Thaddeus-X*, 175 F.3d at 397 (quoting *Bart v.Telford*, 677 F.2d 622, 625 (7th Cir. 1982.)) "The plaintiff's evidentiary burden is merely to establish the factual basis for his claim that the retaliatory acts amounted to more than a de minimis injury." *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002).

Plaintiff contends that the district court erroneously granted summary judgment in favor of the Township and Hudson where Hudson's statements allegedly provided a basis for her termination from Farm Bureau. The district court reviewed and summarized matters from three telephone conversations where Farm Bureau employees, Keilen and Goodman, contacted Hudson and Hudson allegedly made false and/or misleading statements.

### A. July 28, 2006

Plaintiff stated that Keilen's notes from his July 28, 2006 conversation with Hudson revealed false statements, which constituted an adverse action against her. In particular, the alleged comments stated that Plaintiff was "very antagonistic against the Township" and that she had "written a nasty

article to the editor bashing the Township." (Pl. Br. 24.)  Hudson allegedly stated that Plaintiff was "saying things in Planning Commission meetings that she should never say" and  if Plaintiff "would tone it down and remove her sign then her problems with the Township would go away."  (*Id*. at 24–25.)

### B.      November 15, 2006

During the November 15, 2006 conversation between Hudson and Goodman, Hudson allegedly stated that "Ms. Fritz pushes the envelope as far as she can and that the neighborhood was not happy."  In addition, Hudson stated that the "neighborhood was up in arms and that Farm Bureau needed to be concerned because of the publicity regarding Ms. Fritz and Ms. Fritz's conduct about its reputation." (*Id*. at 11–12.)

### C.      March 1, 2007

Goodman had an additional phone conversation with Hudson on March 1, 2007, where Hudson allegedly "complained in a frustrated matter to her that Ms. Fritz had the Township in an uproar and that he was about to lose his (Township) Board over it." (*Id*. at 11.)  Hudson further stated that he was "sick of Ms. Fritz and her video camera." (*Id*. at 12.)  He also indicated that "Ms. Fritz can't be selling insurance because of the extent of her other activities that he had just referenced and that people refused to talk to her." (*Id*.)

In viewing the notes in a light most favorable to Plaintiff, the district court assumed that all of the notes reflected Hudson's statements.  Hudson's statements answered questions regarding complaints Farm Bureau received from Plaintiff's neighbors and citizens of Comstock, as well as articles that appeared in the local media.

The district court concluded that there was insufficient evidence to prove an adverse action by Hudson against Plaintiff. In doing so the district court relied on guidance provided by this court in *Fritz*, where we stated:

> If Defendant Hudson in fact made statements that were designed to communicate to Farm Bureau that it would be in the business' interest in terms of its dealings in Comstock to reign in Plaintiff's exercise of her First Amendment rights, or that it would be better for Farm Bureau to cancel its contract with Plaintiff, that would be an adverse action sufficient to support a claim of retaliation.

592 F.3d at 725.

We agree with the district court that there is no evidence of a threat by Hudson directed at Farm Bureau. In reaching this conclusion, we have also reviewed the termination letter presented to Plaintiff. Although the letter refers to "controversial community relations with her neighbors and with the governmental unit," there is no dispute among the parties that it was Farm Bureau, and not Hudson or Comstock, reacting to neighbor conflicts and newspaper accounts, that initiated Farm Bureau's investigation of Plaintiff. In addition, there is no evidence that could reasonably be construed as a directive from Comstock or Hudson that Farm Bureau should alter its employment relationship with Plaintiff. There was, however, evidence that Plaintiff's working relationships, including her unwillingness to follow her supervisor's instruction as to her behavior in the community, were significant factors in Plaintiff's termination.

In *Paige v. Conyer*, a recent decision by this court, we were presented with allegations that the county official retaliated against the plaintiff by calling her employer and saying false things about a speech made by the plaintiff at a public hearing. 614 F.3d at 276–77. The plaintiff's employer, which was involved in the development of commercial properties in the county, allegedly

fired the plaintiff as a result of the county official's call, which was the county official's desired result. This court reversed the grant of a 12(b)(6) motion to dismiss and remanded the case to the district court for further proceedings. *Id*. at 284.

The inquiry in this case as to whether Hudson's statements amount to an adverse action also requires us to consider Hudson's First Amendment right to respond to the resident complaints and Plaintiff's criticisms of the Township ordinance. In *Mezibov*, we found that a criminal defense attorney's alleged speech fell within the constitutionally protected right to respond. 411. F.3d at 722. We stated that

> It would be inconsistent with core First Amendment principles and basic notions of fairness not to allow [a government official] to respond to [allegations of unethical conduct] to the extent his out-of-court comments were not defamatory, even if that response was (quite naturally) prompted by constitutionally protected speech by [the plaintiff].

*Id*.

We are faced with a similar situation in this case. Unlike the facts presented in *Paige*, the majority of the comments by Hudson were made in response to Keilen and Goodman's questions about the issues involving Plaintiff's home office. Keilen had been instructed by his superior at Farm Bureau to conduct an investigation. As part of this investigation, Keilen initiated a private communication with Hudson focusing solely on the issues concerning the complaints made by the residents; and to better understand the Township's special exception ordinance for Plaintiff's home office. Hudson stated his opinion in response to Keilen's questions. Hudson's answers also included responses to criticism that Plaintiff made in public.

Although we have previously recognized that in some cases "injury based on embarrassment, humiliation, and emotional distress" is sufficient to be actionable under § 1983, *see Bloch v. Ribar*, 156 F.3d 673, 679–80 (6th Cir. 1998); *see also Barrett v. Harrington*, 130 F.3d 246 (6th Cir.1997), *cert. denied*, 523 U.S. 1075, 118 S.Ct. 1517, 140 L.Ed. 2d 670 (1998), we find that such circumstances did not exist in the present case. For example, in *Bloch*, the defendant police officer revealed to the media intimate and humiliating details about the victim's rape. In *Barrett*, a judge retaliated against a defense counsel by issuing press statements that falsely accused the lawyer of stalking. We find such cases inapplicable as the conduct was extreme and the allegations are distinct from the allegations in the present case. Here, Hudson's speech did not amount to any outlandish allegations. *See Thaddeus-X*, 175 F.3d at 398 (emphasizing that "certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, [and that] this threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment"). We further note that during oral argument, Plaintiff had trouble identifying statements that amounted to the adverse action of terminating Plaintiff's contract with Farm Bureau. Therefore, we cannot conclude that Hudson's actions would "deter a person of ordinary firmness from continuing to engage in that conduct." *Id*. at 394. We therefore believe that the district court appropriately concluded that Plaintiff cannot prove an actionable adverse action.

### 3. Causal Connection

The third element that Plaintiff must satisfy is whether "there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiffs

protected conduct." *Id.* This element requires us to subjectively consider Defendant's motivation for his statements. *Id*. at 399. We note that "because of the difficulty in providing direct evidence of an official's retaliatory motive, circumstantial evidence can suffice." *Hill v. Lappin*, 630 F.3d 468, 475 (6th Cir. 2010) (citing *Holzemer v. City of Memphis*, 621 F.3d 512, 525–26 (6th Cir. 2010)).

We find no causal connection between Plaintiff's protected speech and the adverse action of her termination. As an initial matter, Hudson did not "have the authority to take any township action against Farm Bureau" as he was merely a Township Supervisor and was not part of the administrative body. (Defs.' Br. 55.) We have previously held that a mayor could not be held liable under a § 1983 claim against a city council clerk when the mayor lacked control or could not adversely affect the clerk's employment. *See Poppy v. City of Willoughby Hills*, 96 F.App'x 292, 295 (6th Cir. 2004) (holding that since the mayor "was not the decisionmaker, he cannot be held liable under § 1983 for the City Council's decisions regarding [Plaintiff's] terms and conditions of employment"). Hudson was not in a position to terminate Plaintiff from Farm Bureau and lacked authority to take adverse action against her.

We also find insufficient evidence in the record to support Plaintiff's contention that Hudson wanted Plaintiff terminated from her position at Farm Bureau. Keilen's deposition testimony established that Hudson did not want to take any action against Plaintiff. The following exchange took place at Keilen's deposition:

> Q: Incidentally, did Tim Hudson ever ask you to fire Sue Fritz?
> A: No.
> Q: Did he ever try to encourage you to fire Sue Fritz?
> A: No.
> Q: Or discharge her?
> A: No.

Q: Or take any disciplinary action against her?
A: No.

(R.66–5: Keilen Dep. 46.) Keilen's testimony supports the conclusion that Hudson never requested that Plaintiff be terminated from her position. Hudson did not take action or threaten to take action against Farm Bureau or Plaintiff during the course of Plaintiff's tenure as an insurance agent.

Luxmore, a supervisor at Farm Bureau further supported Keilen's testimony that neither Hudson nor the Township bore any responsibility for Plaintiff's termination. Luxmore stated the following:

Q: Did you ever feel pressure by . . . the township to fire or discipline Sue Fritz?
A: Township does not make the decision to terminate employees.
Q: The township was not involved in that decision?
A: Absolutely not.
Q: And you never felt any pressure influenced by the township to take that action?
A: I didn't feel the pressure. What I did feel is just the whole correspondence of what was transpiring as far as can I have an office, can I have staff people, not have staff people. So frustration from that end, yes, but absolutely no way did I feel that I was forced to terminate as a result of [the Township.]
. . . .
Q: So again, would you have terminated Sue Fritz irrespective of her relationship with Comstock Township?
. . . .
A: I did not terminate or recommend termination because of the conflicts with Mr. Hudson or the township, et cetera.

(R.69–15: Luxmore Dep. 69–70.)

Although the termination letter, prepared by Farm Bureau's legal counsel and signed by Luxmore, referenced Plaintiff's practices, methods, and contentious relationship with the community, Luxmore stated that the decision to dismiss Plaintiff was based on her working relationship with her insurance supervisor and also concerns about Farm Bureau preserving a

15

favorable reputation in the community. Defendants are not required to accept Plaintiff's conduct and have presented sufficient evidence of a legitimate reason for Plaintiff's termination.

We find that Plaintiff has not sustained her burden to prove the alleged retaliatory acts committed by Hudson amounted to an adverse action, nor can Plaintiff prove the requisite causal connection between her protected speech and the alleged adverse action, or that the reasons articulated by Defendant are pretextual in nature.

## CONCLUSION

For the reasons stated above we **AFFIRM** the decision of the district court.